**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| J.L. NIEMAN, individually | § CIVIL ACTION NO: _____ |
| | § |
| Plaintiff | § 3:17-cv-1430-J-20JRK |
| | § |
| vs. | § |
| | § |
| NATIONAL CLAIMS ADJUSTERS, INC. | § |
| And DAVID P. IERULLI | § |
| | § **INJUNCTIVE RELIEF SOUGHT** |
| Defendants | § |

## PLAINTIFF'S ORIGINAL COMPLAINT AT LAW AND DEMAND FOR JURY TRIAL

Now Comes Plaintiff J.L. NIEMAN ("Nieman"), *Pro Se,* subject to authorization granted under Section 1654 of title 28 of the United States Code for self-representation, and the constitutions of the United States of America, complaining against Defendants National Claims Adjusters, Inc. and David P. Ierulli, individually and as alter ego for National Claims Adjusters, Inc.   Plaintiff certifies this pleading compliant with the local rules for the Middle District of Florida, including the formatting rules, to the best of his abilities.

### INTRODUCTION

1.  Plaintiff brings this action under United States federal and Florida common law to redress violations as to (a) Defendants' intentional and/or negligent misclassification of employees as independent contractors, (b) Defendants' failure to pay required wages under the Fair Labor Standards Act, (c) retaliation against Plaintiff by Defendants for his having raised lawful and good faith complaint to the United States Department of Labor Wage and

Hour Division ("DOL") as to Defendants' unlawful business practices, (d) Defendants' actions directly, and/or by way of authorized employees and/or agents in fraudulently inducing Plaintiff and others similarly situated to work for them as insurance adjusters or professionals knowing fully that they (Defendants) would attempt to avoid paying some or all of the legitimately agreed and owed wages and/or commissions, (e) promissory estoppel as to soliciting Plaintiff and/or others similarly situated to work as hourly employees and then refusing to pay those wages without just cause, (f) to seek redress for unjust enrichment that NCA and Ierulli have enjoyed as to Nieman's work product without having provided him just and agreed compensation for such work, (g) for violations of the Florida Private Employer Whistleblower Act, Fla. Stat. § 448.102, (h) for violations of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat § 501.211(s)  and (i) for actual or impending violations of 26 U.S.C. §7434 (filing fraudulent federal information return(s) falsely claiming Nieman as an independent contractor).

2. Plaintiff is also seeking a formal declaration by the Court that he and those similarly situated are employees and not independent contractors as to NCA/Ierulli. Because NCA/Ierulli have materially breached their express and/or oral promises, Nieman is also seeking a declaration of the Court that the non-competition, employer's prevailing party fees, and related covenants are null, void, and unenforceable based upon doctrines of unclean hands and/or latches.

3. Inclusive of pecuniary, compensatory, and punitive damages, Plaintiff is seeking damages in excess of $50,000.01 in this matter along with injunctive, equitable, and other just relief.  Plaintiff demands an accounting at law or, in the alternative, an equitable

accounting as to the finances of NCA/Ierulli, including, but not limited to, payments

NCA/Ierulli have received from the various insurer/third party administrator clients for

invoices submitted to such clients in direct relation to Plaintiff's field adjusting and/or claim

examiner work product.

4.  Because of the evidence that Defendants actions have been intentional and/or

reckless, and as such actions have been and continue to be part of a pattern and practice of

fraud and related outrageous behavior, Plaintiff is seeking punitive damages against the

Defendants.

## JURISDICTION AND VENUE

5.  This court has jurisdiction pursuant to 28 U.S.C. 1331 as this matter involves

federal question including causes under statutes including, but not necessarily limited to, the

Fair Labor Standards Act, 28 U.S.C. § 201 et seq. ("FLSA") and 26 U.S.C. §7434.

6.  Venue is proper as Plaintiff and both Defendants reside within the Middle District

of Florida.  Plaintiff is a resident of St. Johns County, Florida, and a substantial portion of

the employment at issue as to Plaintiff's employment activities occurred in Duval or St.

Johns Counties in Florida .  Defendants regularly do business in this district, and reside in

Manatee County, Florida.  Most of the wrongful acts by Defendants apparently occurred

within these counties.

7.  Prior to bringing this action, Plaintiff filed a formal complaint with the United

States Department of Labor, Wage and Hour Division ("DOL"), by and through its regional

Director for the Tampa Region, James Schmidt.  Despite the obvious jurisdiction of this

federal agency, and the likely breadth of the issues as to a significant number of similarly

situated employees and/or insurance professionals, the DOL has thus far refused to acknowledge the complaint other than by virtue of a single phone call from a representative who stated that DOL was not planning to even send a written acknowledgment as to the charge. After Plaintiff politely reminded the caller that this was not permissible under DOL's own rules, the caller stated that the decision would be made "by the Director". Notwithstanding, DOL has provided no further acknowledgement to the charge/complaint. Accordingly, left with no apparent administrative option, and in light of NCA/Ierulli's penchant for filing litigation which is highly suspect in nature and/or basis, if not objectively and subjectively frivolous, Nieman has been forced to initiate this action, reluctantly.

## PARTIES

8. Plaintiff Nieman ("Plaintiff Nieman" or "Nieman") is a native born citizen of the United States of America, who resides in St. Johns County, Florida. For nearly thirty years, Nieman has been working as a property and casualty insurance claims professional throughout the United States. Nieman carries an impressive array of skills and credentials including an undergraduate degree in finance and a master of business administration degree, both from highly respected institutions. Nieman also has earned numerous and highly sought insurance designations (AIC, CPCU, SCLA, AIM, ARM) as well as the Six Sigma Green Belt designation. Nieman is highly respected in terms of his education, skill, professionalism and character by a large percentage of the insurance and legal community.

9. At all relevant times, Defendant National Claims Adjuster, Inc. ("NCA") has operated as a domestic (Florida) for profit corporation, maintaining a home office home office located in Bradenton, Manatee County, Florida. NCA holds itself out to be an

independent claim adjusting enterprise, offering services throughout the United States. https://www.nclaimsadjusters.com/. NCA's business model is that they attempt to claim employees and/or contractors as 1099 independent contractors and avoid providing them worker's compensation insurance and/or other benefits, and do not complete tax withholding or other employer type duties. They also charge such employed persons $250.00 under the guise of providing insurance coverage for Errors and Omissions (E&O) or similar coverage if the employed person does not prove that they have their own separate coverage.

10. At all relevant times, David P. Ierulli held himself out as owner, president, and/or registered agent of National Claims Adjusters, Inc. Ierulli is the alter-ego for NCA and also apparently co-mingled funds with the corporation as all commissions payments made to Plaintiff came from a bank account in Ierulli's name, and not the corporate name. Accordingly, NCA and Ierulli are indistinguishable as legal entities. Evidence also supports the conclusion that Ierulli formed NCA with fraudulent intent; so that he could conduct business in a manner that regularly occurs in a tortuous and fraudulent manner, yet with the intention of shielding his personal assets from the consequences of such tortuous and/or illegal conduct. Such fraudulent intention allows "piercing of the corporate veil" under Florida law. Additionally, because the statutory violations and torts of NCA are arguably Ierulli's torts, or were committed by Ierulli irrespective of his standing as owner and/or corporate officer for NCA, he is subject to personal liability for such misconduct.

11. Based upon good evidence, NCA/Ierulli are retaliatory and/or vexatious litigants who have regularly abused the legal process in seeking to avoid payment of lawfully owed wages and/or commissions to claims professionals like Nieman, and/or in seeking to

wrongfully restrict the rights of others (former employees/contractors, or competitors) as to claims adjusting services.  The Manatee County court website alone shows NCA as having been plaintiff in eight actions since 2006, six since 2012:

*https://www.manateeclerk.org/PublicRecords/CourtRecordsSearch/tabid/57/ctl/results/mid/ 484/Default.aspx.*

Of these lawsuits, the majority involved lawsuits against claim professionals, with pled allegations as suspect as that the adjuster sent reports directly to the client as basis for the litigation.  Upon good faith and/or available evidence, NCA/Ierulli have used threats of litigation and/or a reputation as abusive litigants to cause persons similarly situated to Nieman to simply abandon legitimate claims for hourly wages or commissions justly owed to them.  Attorney Peter J. Mackey of the Mackey Law Group (Bradenton, FL) is listed as counsel for NCA in most, if not all, of these actions.  Mackey is currently the subject of at least one active (consolidated) formal disciplinary action filed by the Florida Bar before the Florida Supreme Court. *The Florida Bar v. Peter John Mackey,* Nos. 2014-10,338, 2015-10,564 (accusing him of violations of the Florida Bar rules including violations of rule 4-8.4 (a) (A lawyer shall not violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another); and 4-8.4(d) (A lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, jurors, witnesses, court personnel, or other lawyers)).

12. NCA has also been previously sued and is currently in active litigation as to highly similar claims of fraud, unjust enrichment, failure to pay wages/commissions, and breach of contract. *See Tony Maltese and Robert Seals v. National Claims Adjusters, Inc.*, No. 41 2012 CA 008194 AX. https://www.manateeclerk.org/PublicRecords/CourtRecordsSearch/tabid/57/ctl/detail/mid/4 84/Default.aspx?enc=MTc0Mjc2Mw%3d%3d-g6CngewAY4I%3d. The allegations by Seals and Maltese are highly similar to those of Plaintiff Nieman; that they were lured away from other roles based upon the promises of NCA/Ierulli only to find that NCA/Ierulli reneged on the promises (never intended to be fully kept by NCA/Ierulli), which Seals and Maltese had relied upon to their detriment.

### STATEMENT OF THE ULTIMATE FACTS AND/OR ALLEGATIONS

13. In or around early September 2017, with Hurricane Irma expecting to make landfall in Florida, NCA began soliciting inside claim examiners and outside field adjusters to join its team, promising highly competitive commission rates of 70% of the billed fee(s) for field work. Such solicitation was advertised on a national website, reaching claim professionals all over the United States: http://www.catadjuster.net/viewad.asp?s=adjusters-needed-asap-for-hurricane-irma-property-desk-examiners&id=50010638875102489.

14. Nieman responded to the solicitation on September 7, 2017 via email, to NCA employee Samantha Brown ("HRDepartment@NClaimsAdjusters). Nieman advised that given the option, he would prefer to work as a residence based (remote) claim examiner but would consider field deployment. After several interactions, Nieman agreed to "commit" to

NCA as either an inside examiner (at a daily wage rate of $500.00 per day) or field adjuster (on a 70% commission basis). See Complaint exhibit A, attached.

15. Thereafter, Nieman continued to regularly receive communications from NCA. One such item, from NCA Vice President of Claims Kim Dlgauskas reconfirmed the "70% Adjuster Commission Rate" and stated "each of you will do well, especially after a couple hundred claims." See complaint exhibit B, attached. Despite his regular follow-ups and/or responses, Plaintiff Nieman found NCA's leadership to be somewhat slow to respond as to his actual engagement and/or deployment. In the interim, he was also solicited by The Best IRS (Dawg, Inc.), asked to deploy to South Florida to handle claims on or about September 12, 2017, and agreed on September 14, 2017.

16. On September 15, 2017 Plaintiff Nieman also received a "Deployment Notification" from NCA (Samantha Brown). Nieman responded that he had been asked to deploy to South Florida for another entity but would consider returning home to the Jacksonville area if there was work for him. Brown encouraged Nieman to return to Jacksonville so that NCA could begin sending him claims. On September 27, 2017, after completing the work that had been initially assigned to him by Best IRS and concluding that relationship on good terms, Nieman confirmed to Brown that he had returned to the Jacksonville area and was ready to start taking claims. (See Complaint exhibit C, attached). Despite the fact that Nieman was not licensed in Georgia, NCA prepared to begin assigning him claims there. Fortunately, Nieman immediately recognized the issue, informed Brown of the problem. Through his diligence and good standing, Nieman was able to quickly gain licensing in that jurisdiction (paying a $121.18 fee to do so) and resolved the crisis that

would have been present if NCA had assigned an adjuster to handle claims in a jurisdiction they were not licensed in.

17. NCA began sending Nieman assignments on September 30, 2017, and he received about thirty to forth in the next few days. Nieman promptly set appointments on the claims where the insureds were available, and began setting appointments for inspections. Despite the fact that a number of the assignments were as far away as southeastern Georgia, Nieman worked diligently and in a highly professional manner to get his losses inspected and to begin submitting estimates and reports for NCA and client consideration. Despite this diligence, and the submission and acceptance of several files, Nieman noted that no commissions were being paid.

18. Nieman also noted that despite claims by NCA that they would not control the ways or means by which he completed his duties, NCA/Ierulli exercised extreme control over Nieman and the other insurance professionals by way of (a) insistence that they enter data in NCA and client systems in a highly specific manner, (b) that they deactivate Xactimate labor minimum charges even when adjusters such as Nieman pointed out that such could potentially be a violation of the Unfair Claims Practices Acts (intentional underpayment of claims), (c) by demanding that all potentially non-covered aspects of damages not be included in claim estimates even though professionals such as Nieman are generally engaged in such roles as pure "damages" appraisers and estimators, (d) exercising unusually strict control as to reporting forms and methods. Such exercise of significant control over Nieman and others similarly situated is such that Nieman and his peers are actually employees, and not independent contractors, under federal and/or Florida law tests.

19. On or about October 6, 2017, Nieman was contacted by Samantha Brown and first asked to sign a written contract for NCA. Based upon what he had already seen, he strongly anticipated that if he raised issue as to the contract that NCA would likely attempt to renege on the agreement and try to avoid paying him commissions on the significant work he had already completed for them. According, with significant concerns, and under duress, he reluctantly agreed to sign the agreement in hopes that NCA would pay what they had promised.

20. By October 19, 2017, Nieman had only received a few hundred dollars in commissions and despite reasonable and consistent efforts, was unable to secure any indication as to when he might be paid by NCA from Mary Ellen Hall (bookkeeper), Dlugauskas, or Brown. Conversely, at that point Nieman had inspected and/or concluded nearly all of his assigned losses and the feedback on his work product had been very favorable from NCA leadership and/or examiners. Because of the inherent risks of field claim adjusting in this context (which involves hazards of climbing roofs, and extensive road travel), and the associated expense (vehicle mileage, fuel, and related expense), Nieman advised NCA/Ierulli that he could not continue to take assignments from NCA, particularly not out of state (in Georgia) if he could not receive some type of commitment that he would be paid, and/or actual payment for the extensive commission already owed. On October 19, 2017, Nieman contacted NCA leadership by email about the situation, advised that he had 19 inspections completed with estimates and reports pending and would work down his pending without accepting any new assignments if NCA had no objection.

Ierulli directed that Nieman's uninspected losses be reassigned, but otherwise offered no objection to Nieman's proposal.

21. Thereafter, on October 22, 2017, Ierulli himself contacted Nieman via email and asked him if he could take losses in Georgia again. Nieman reminded Ierulli of the situation as to the lack of payment for his outstanding work. Ierulli responded, *"You need to speak to accounting but you get paid like everyone else with no exceptions. Anything closed, billed, and client approved by the cut off date, you get paid on the next pay cycle, unless the file is kicked back."* (Complaint exhibit E). But because NCA/Ierulli were not apparently adhering to their own procedures, and Nieman had not been paid for files that appeared to fit the profile, Nieman declined any additional assignments at that time.

22. By mid-November 2017, Nieman had worked down all of his files for NCA and most, if not all, of his files had been accepted by NCA's leadership as acceptable and invoiced to various clients. On November 16, 2017, Nieman finally received a fairly large commission payment and was cautiously optimistic that NCA would make good on the remaining commissions (approximately $10,000 at that time). On November 17, 2017, Nieman received a phone call from a person identifying themselves as David Crauwels, an examiner for NCA. Crauwels noted that there was a bit of a crisis involving another adjuster who had not used the required estimating system (Xactimate) and that a significant number of his files needed to be re-written on the Xactimate system. Crauwels asked Nieman if he would agree to work on the project for an hourly rate of about $35 to $40 per hour. Nieman stated that he would agree to participation at a $40.00 an hour rate. Crauwels called back a few minutes later and stated that David Ierulli had "signed off" on the proposed rate and that

assignments would be coming shortly.  On that same date, V.P. Claims Kim Dlugauskas

sent an email to Nieman and Crauwels thanking Nieman for agreeing to assist on the project.

So that there would be no misunderstanding, Nieman confirmed the agreement via email to

Crauwels and Dlugauskas via email on that same date, including the $40.00 an hour rate.

23.   Over the next several days, Nieman worked very hard to correct the files and re-

write the reports as to corrected estimates.  His work product and diligence was praised by

Crauwels several times.  After the project was completed, Crauwels asked Nieman to work

in a similar manner on  some other files, and he did so up until when he needed to cease

such work in anticipation of starting a new full time role on or about 11/27/2017.

Ultimately, Nieman submitted a total of 33.2 hours to NCA, with a detailed listing of the

time expended and which file the time related to.  The time sheets were accepted by Hall

and Crauwels without objection and Crauwels confirmed the agreement and payroll request

to Dlugauskas on November 25, 2017.  In that communication thread, Nieman also noted

that his records showed $11,101.98 in commissions as outstanding, for the November 30,

2017 pay cycle. (See Complaint exhibit D, attached).  Consistently late as to payment of

commissions, the payment for the 11/30/2017 cycle did not occur until December 4, and

then only amounted to $2,396.42.  The hourly wages were not paid as part of this event, but

no explanation was given for this lapse.

24.   Given that NCA had been slow, at best, as to payment of commissions and

wages, on December 11, 2017 Nieman sent a reminder to Hall and Dlugauskas as to the

outstanding amounts for hourly wages and commissions ($12,717.94).  Hall responded on

that date that "Payroll is currently being processed. I am unable to let you know what your EFT will look like on Friday."

25. On December 15, 2017 Nieman received an email from Hall indicating that his payment for the period would be only $415.00. That payment (via electronic funds transfer (EFT) and again in the name of "David P. Ierulli) was not received until 12/20/2017. While only one file was paid as commission, another (NCA claim number 17526) received a clawback of $756.50 for alleged "overpayment". NCA also deducted $250.00 for alleged "E&O Insurance". Nieman contacted Hall (carbon copy to Dlugauskas) and asked for an explanation, showing information from the claim file that the deduction was likely an error. No explanation or justification has ever been received from Hall or anyone else at NCA. Additionally, a second cycle passed without payment of the promised hourly wages though the email from Hall stated that the EFT "does not include time spent on Randy Robertson's files. Hoping to finish compiling that on Monday and another disbursement will be made when completed."

26. Growing increasingly frustrated at NCA's refusal to pay the wages and commissions rightfully owed to him, Nieman began researching his options. Based upon this research, he initiated a formal complaint against NCA and Ierulli with the United States Department of Labor. Being extremely transparent, he included NCA/Ierulli on his complaint, including the supports as to the unpaid (yet undisputed) wages and commissions. (See excerpt, at Complaint exhibits F, G, and H).

27. Ierulli responded almost immediately, on December 17, stating "Direct all future inquiry to attorney Jay. I am not putting up with you any longer." (See Complaint exhibit I,

attached). Thereafter, based upon the direct evidence and/or reasonable inference, Ierulli took the following retaliatory steps: (a) he directed Hall to cease activity as to paying the hourly wages owed to Nieman, (b) he directed that Nieman's NCA systems access be cut off immediately. Both actions were taken within hours of Nieman's good faith complaint to DOL, which NCA/Ierulli offered no rebuttal to and are in sufficient temporal proximity to support a finding that they were acts of retaliation directly correlated to Nieman's good faith and proper complaint to DOL. Additionally, the acts of NCA/Ierulli support the conclusion of a de facto termination of employment of Nieman by NCA/Ierulli, in retaliation for Nieman's good faith and proper complaint to DOL.

28. Subsequent to these events, Nieman has received no further contact of merit by NCA/Ierulli or their attorney (Peter Mackey), and he has received no further payments as to his outstanding wages and/or commission payments owed by NCA/Ierulli.

### COUNT I: VIOLATIONS OF THE FAIR LABOR STANDARDS ACT

29. Paragraphs 1-28 are incorporated by reference, as applicable, against all Defendants.

30. Based upon direct evidence and/or reasonable pre-suit investigation, Defendants NCA and Ierulli are subject to the jurisdiction of the Fair Labor Standards Act, 28 U.S.C. § 201 et seq. NCA and Ierulli fit the statutory definitions of an "Employer" under 29 U.S.C. §203(d). Additionally, Nieman fits the statutory definitions of an "Employer" under 29 U.S.C. §203(e). In his work for NCA/Ierulli and as to their regular and recurrent operations, NCA/Ierulli and Nieman used interstate telephone, travel (including to the State of Georgia), and Internet based mail and computer systems. NCA/Ierulli, as evidenced in

part by their numerous lawsuits against out of state claims adjusters, also engage in the movement of goods and/or persons across state lines as to soliciting claims professionals to work for them, payment of wages for such activities, and solicitation and/or work for out of state clients. Such activities fall under the definitions of covered enterprises and persons pursuant to 29 U.S.C. §203(s)(1), particularly as the work involved creation of reports, estimates, and related materials which were transmitted electronically to insurers, outside claims administrators, and related stakeholders, subjecting them to the FLSA under 29 U.S.C. §203(b). Upon reasonable belief and/or evidence, NCA's gross sales or claimed fees to its various insurance company/claim administrator clients exceeded $500,000 in 2017, placing them additionally within the jurisdiction of the FLSA's enterprise trigger. 29 U.S.C. §203(s)(1)(A).

31. NCA/Ierulli hired Nieman as an hourly worker from November 17 to about November 25, 2017, at a rate of $40.00 per hour. Nieman completed all requested work of him, in a high quality fashion and there were no complaints about his performance or work product.

32. NCA/Ierulli have subsequently, and without reasonable cause or justification, refused to pay Plaintiff Nieman his owed hourly wages, even at the federal minimum wage level, constituting material violations of the FLSA

33. NCA/Ierulli also hired Nieman on or about September 30, 2017 as a commission field claims adjuster with a promised commission rate of 70% of all billing on files accepted by the NCA/Ierulli's clients. Defendants NCA/Ierulli have also failed to pay Plaintiff Nieman any wages for eighteen claims which he work on, which he submitted to NCA,

which NCA accepted as meeting their standards, which NCA then submitted to their clients with invoices for the clients to pay.  The failure to pay any wages, including at minimum wage level, for such work constitute direct violations of the FLSA.

34. Almost immediately subsequent to being made aware that Plaintiff Nieman had complained to the U.S. DOL about their failure to pay wages/commissions and other apparent misconduct, Defendants NCA/Ierulli (1) effectively terminated his employment and cut off all systems access to Nieman, (2) quashed the planned payment for the outstanding hourly wages which had been noted as imminent (though delayed) by NCA employee and/or agent, Mary Ellen Hall.  Such actions constitute impermissible, and Defendants NCA/Ierulli were specifically prohibited from discharging Nieman as an employee for taking part in protected conduct, pursuant to 29 U.S.C. §215(a)(3).  Nieman has suffered damages based upon Defendants' actions.

WHEREFORE, Nieman requests that judgment be entered in his favor, and against NCA/Ierulli, for outstanding and/or owed wages and commissions, potential liquidated (double) damages on all or part of the owed wages and/or commissions, pre-judgment interest, reasonable attorney's fees and costs, and emotional distress damages.  Nieman also is also entitled to equitable relief by way of an order of this Court such that Nieman and others similarly situated should be deeded employees and not independent contractors, and NCA/Ierulli should be ordered to retroactively correct his status to that of W-2 employee, take proper withholding, pay employer's share of employment taxes and other related items, and to refund monies withheld for errors and omissions insurance as an employee such as Nieman is a definitional insured on the insurance policy(ies) of NCA/Ierulli.  Plaintiff

Nieman also seeks an injunctive order against NCA/Ierulli whereby they be directed by the Court to cease improper misclassification of employees as independent contractors, and that they be ordered to cease and desist all illegal retaliatory actions against Nieman and others similarly situated, who have properly asserted their rights under the Fair Labor Standards Act, or similar state and/or federal statutes.

### COUNT II: BREACH OF CONTRACT; EXPRESS AND/OR ORAL

35. Paragraphs 1-34 are incorporated by reference, as applicable, against all Defendants.

36. In September 2017, Defendants solicited Nieman to engage as contracted worker for NCA/Ierulli on a commission basis. He was promised 70% commission for his work and the indication from NCA's leadership was that Nieman and others would "do well". (See Complaint exhibits A through C). NCA/Ierulli and Nieman also engaged in conduct evidencing the existence of implied-in-fact contracts. NCA/Ierulli material breached the agreement by invoicing clients and then refusing to pay Nieman for his work product, without reasonable cause or justification.

37. Nieman was also subsequently solicited and enticed to do hourly work for NCA/Ierulli at an hourly rate of $40.00 per hour for providing assistance to correct and/or translate claims estimates, photo sheets, and/or other reports to the Xactimate system and/or to otherwise correct reports for other contracted claims adjusters so that NCA could submit them to their clients along with bills for services. NCA/Ierulli and Nieman also engaged in conduct evidencing the existence of implied-in-fact contracts. NCA/Ierulli materially breached the agreement by refusing to pay Nieman promised hourly wages.

38.  To the extent NCA/Ierulli attempt to claim the benefit of any written agreement secured from Nieman after he was already engaged as contracted employee, including any time termed "Independent Contractor Agreement" they are barred from seeking any redress under such document by way of the doctrine of estoppel and/or unclean hands.  To the extent Defendants are seeking any relief as to the alleged non-competition clause such relief is barred by Florida public policy as the breadth and extent of interference with working rights that NCA/Ierulli seeks as to its contracted employees is so broad and excessive as to be contrary to public policy, anti-competitive in its nature in contravention to Florida law, and not reasonably required or justified as to the legitimate business interests of NCA and/or Ierulli.

39.  Nieman has suffered damages by way of NCA/Ierulli's actions and/or his detrimental reliance upon their promises.

WHEREFORE, Nieman requests that judgment be entered in his favor and against NCA/Ierulli, for outstanding and/or owed wages, commissions, pre-judgment interest, reasonable attorney's fees and costs, emotional distress damages.  Nieman is also entitled to equitable relief by way of an order of this Court such that Nieman and others similarly situated should be deeded employees and not independent contractors, and NCA/Ierulli should be ordered to retroactively correct his status to that of W-2 employee, take proper withholding, pay employer's share of employment taxes and other related items, and to refund monies withheld for errors and omissions insurance as an employee such as Nieman is a definitional insured on the insurance policy(ies) of NCA/Ierulli.  Plaintiff Nieman also seeks an injunctive order against NCA/Ierulli whereby they be directed by the Court to cease

improper misclassification of employees as independent contractors, and that they be

ordered to cease and desist all illegal retaliatory actions against Nieman and others similarly

situated, who have properly asserted their rights under the Fair Labor Standards Act, or

similar state and/or federal statutes.  Because NCA/Ierulli have shown a pattern and practice

of breaching employment agreements, and because their actions are outrageous and shock

the conscience, Nieman also prays the Court for an entry of punitive damages against

Defendants.

### COUNT III: FRAUD IN THE INDUCEMENT

40.  Paragraphs 1-39 are incorporated by reference, as applicable, against all

Defendants.

41.  Based upon good faith, knowledge, and/or reasonable investigation as to

available information, Defendants NCA and Ierulli, as a general business practice, entice

and/or solicit insurance claims professionals from around the United States to work for them

as contractors, knowing full well that they will not make good on their promises.

42.  Specifically, good faith and other evidence, including the public record of

pleadings and other filings in *Seals and Maltese v. National Claims Adjusters, Inc.*, and

numerous cases filed by NCA in Manatee County, Florida support the conclusion that as a

general business practice, NCA/Ierulli (a) solicit claim professionals to work for them at

competitive or class leading commission or daily wage rates, (b) that they regularly refuse to

pay these wages timely and/or at all, (c) that they consistently deduct improper amounts

such as E&O insurance premiums, mysterious and unexplained deductions of $10 or more

from each commission from lawfully owed wages, (d) that when insurance professionals

object to the failure of NCA/Ierulli to timely pay full wages owed, NCA/Ierulli uses

intimidation tactics such as threats of litigation or actual lawsuits to dissuade them from

securing the wages and/or commission lawfully owed to them, (e) despite exercising

extreme control over contracted insurance professionals, NCA/Ierulli improperly claim such

persons as "independent contractors" and threaten them with "prevailing party fees" or

efforts to prevent them from working in their trade (under "non-competition" clause

arguments) if they object to late and/or non-payment of wages and/or commissions.

43.  NCA/Ierulli's pattern and practice of promises made, promises not kept, and

threats and intimidation to maintain the status quo support a finding of fraud in the

inducement against Nieman and others similarly situated.  Accordingly, Nieman is entitled

to injunctive/equitable relief, damages, and other costs, attorney's fees, and/or remedies

against NCA/Ierulli.

WHEREFORE, Nieman requests that judgment be entered in his favor, and against

NCA/Ierulli, for outstanding and/or owed wages, commissions, pre-judgment interest,

reasonable attorney's fees and costs, emotional distress damages.  Nieman is also entitled to

equitable relief by way of an order of this Court such that Nieman and others similarly

situated should be deeded employees and not independent contractors, and NCA/Ierulli

should be ordered to retroactively correct his status to that of W-2 employee, take proper

withholding, pay employer's share of employment taxes and other related items, and to

refund monies withheld for errors and omissions insurance as an employee such as Nieman

is a definitional insured on the insurance policy(ies) of NCA/Ierulli.  Plaintiff Nieman also

seeks an injunctive order against NCA/Ierulli whereby they be directed by the Court to cease

improper misclassification of employees as independent contractors, and that they be
ordered to cease and desist all illegal retaliatory actions against Nieman and others similarly
situated, who have properly asserted their rights under the Fair Labor Standards Act, or
similar state and/or federal statutes. Because NCA/Ierulli have shown a pattern and practice
of breaching employment agreements, and because their actions are outrageous and shock
the conscience, Nieman also prays the Court for an entry of punitive damages against
Defendants.

**COUNT IV: PROMISSORY ESTOPPEL**

44. Paragraphs 1- 45 are incorporated by reference, as applicable, against all
Defendants.

46. In September 2017, Nieman was encouraged to disengage from an employment
relationship with Best IRS (Dawg, Inc.) by NCA/Ierulli, by and through their authorized
agent Samantha Brown (office manager). NCA/Ierulli, by and through Brown, solicited
Nieman to disengage from the employment relationship with full knowledge that he was
already actively working for another employer. Despite this, NCA/Ierulli, by and through
Brown or otherwise, knew that they would not make good on their promises to timely pay
70% commissions on Nieman's work for NCA/Ierulli which was accepted by them and their
clients. These actions constitute promissory estoppel, such that NCA/Ierulli cannot now try
and avoid payment of the commissions owed to Nieman, particularly as they sent invoices to
their clients on the various work, soliciting full payment for Nieman's work completed on
their behalf.

47.    Similarly, but separately, In November 2017, Nieman was solicited to re-join NCA/Ierulli as a claim examiner (by their agent David Crauwels) for the purposes of assisting in "cleaning up" work product of several NCA field adjusters. Nieman was lured to do this work, rather than focusing on work for another company he was currently engaged with at that time (Frontier Adjusters) with a promise of hourly wages of $40.00 per hour. Despite this, NCA/Ierulli, by and through Crauwels, or otherwise, knew and/or should have known at that time that they would not timely pay the promised wages and/or would attempt to renege on the agreement in whole or part. These actions constitute promissory estoppel, such that NCA/Ierulli cannot now try and avoid payment of the unpaid hourly wages.

48.    Accordingly, NCA/Ierulli are responsible to Nieman for back commissions and wages that remain unpaid, without any just explanation, and Nieman is entitled to damages.

WHEREFORE, Nieman requests that judgment be entered in his favor, against NCA/Ierulli, for outstanding and/or owed wages, commissions, pre-judgment interest, reasonable attorney's fees and costs, emotional distress damages. Nieman is also entitled to equitable relief by way of an order of this Court such that Nieman and others similarly situated should be deeded employees and not independent contractors, and NCA/Ierulli should be ordered to retroactively correct his status to that of W-2 employee, take proper withholding, pay employer's share of employment taxes and other related items, and to refund monies withheld for errors and omissions insurance as an employee such as Nieman is a definitional insured on the insurance policy(ies) of NCA/Ierulli. Plaintiff Nieman also seeks an injunctive order against NCA/Ierulli whereby they be directed by the Court to cease

improper misclassification of employees as independent contractors, and that they be ordered to cease and desist all illegal retaliatory actions against Nieman and others similarly situated, who have properly asserted their rights under the Fair Labor Standards Act, or similar state and/or federal statutes. Because NCA/Ierulli have shown a pattern and practice of breaching employment agreements, and because their actions are outrageous and shock the conscience, Nieman also prays the Court for an entry of punitive damages against Defendants.

## COUNT V: UNJUST ENRICHMENT
### (ALTERNATIVE COUNT)

49. Paragraphs 1- 48 are incorporated by reference, as applicable, against all Defendants.

50. Subsequent to engaging Nieman as a claim professional in their employ, Defendants NCA and Ierulli have sent a number of invoices to their insurance carrier and/or claim administrator clients. Such invoices include work where Plaintiff Nieman acted as field estimator and/or inside examiner (rewrite/correction work).

51. NCA/Ierulli appreciated the benefits of Plaintiff's work and knowingly accepted and retained these benefits. Plaintiff has been harmed by NCA seeking and/or securing payment for Nieman's work product from insurance carrier and/or claim administrator clients without providing the promised commissions and/or hourly wages related to such work.

52. Therefore, under the circumstances it is inequitable for NCA to retain the benefits it received from Plaintiff Nieman without paying the value thereof.

WHEREFORE, Nieman requests that judgment be entered in his favor and against NCA/Ierulli, for outstanding and/or owed wages, commissions, pre-judgment interest, reasonable attorney's fees and costs incurred in prosecuting this action as to NCA/Ierulli's inequitable retention of the benefits Nieman conferred to them.

## COUNT VI: VIOLATIONS OF THE FLORIDA PRIVATE EMPLOYER WHISTLEBLOWER ACT, FLA. STAT. § 448.102

53. Paragraphs 1- 52 are incorporated by reference, as applicable, against all Defendants.

54. On December 17, 2017, Nieman first made his formal complaint to the United States Department of Labor Wage and Hour Division (DOL) as to NCA/Ierulli's apparent intentional and/or negligent misclassification of employees as independent contractors and refusal to pay justly owed wages and commissions.

55. Almost immediately subsequent to Nieman raising good faith issue with the DOL, NCA/Ierulli took the following tangible acts (1) Ierulli responded via email stating "Direct all further inquiry to attorney Jay. I am not putting up with you any longer". (Complaint exhibit J).  Almost immediately thereafter, Nieman's access to NCA's claim systems was revoked, evidencing termination of the employment of Nieman by NCA/Ierulli, (2) the hourly wages payment which NCA bookkeeper Mary Ellen Hall had stated was set to be finalized on or about December 18, 2017 was quashed by NCA/Ierulli.  (Complaint exhibit E).

56. The retaliatory termination of Nieman's employment relationship with NCA/Ierulli, and quashing of the efforts aimed at paying him all or part of his outstanding

hourly wages constitutes unlawful and actionable retaliation under the Florida Private Employer Whistleblower Act, Fla. Stat. § 448.102(1), (2).  To the extent NCA/Ierulli's action was motivated in part by Nieman's objections to DOL and/or internally as to NCA's pattern and practice of forcing adjusters to deactivate Xactimate labor minimums (an arguable unfair claims practices act violation as to intentional underpayment of claims), such is a separate and distinct actionable violation under § 448.102(3).

WHEREFORE, Nieman requests that judgment be entered in his favor, against NCA/Ierulli, for outstanding and/or owed wages, commissions, pre-judgment interest, reasonable attorney's fees and costs, emotional distress damages.  Plaintiff Nieman also seeks an injunctive order against NCA/Ierulli whereby they be ordered to cease and desist all illegal retaliatory actions against Nieman and others similarly situated, who have properly asserted their rights under the Fair Labor Standards Act, or similar state and/or federal statutes.  Because NCA/Ierulli have shown a pattern and practice of retaliation against employees and/or engaged insurance professionals, and because their actions are outrageous and shock the conscience, Nieman also prays the Court for an entry of punitive damages against Defendants.

## COUNT VII: VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), FLA. STAT § 501.201 ET SEQ.

57.  Paragraphs 1- 56 are incorporated by reference, as applicable, against all Defendants.

58.  Good evidence supports the conclusion that NCA and Ierulli regularly misclassify insurance professional employees as independent contractors to avoid paying

employer's payroll taxes, and for other impermissible reasons. Such has been established as an unfair method of competition and has caused damages to Nieman, others similarly situated, and competitors in the industry. Such is a material violation of Fl. Stat. §501.211.

59. Good evidence also supports the conclusion that NCA and Ierulli regularly use actual litigation and/or threats of litigation as an impermissible mechanism to refuse to pay commissions and/or wages to contracted employees and/or insurance professionals.

60. The Florida Deceptive and Unfair Trade Practices Act prohibits (a) unfair methods of competition and (b) unfair or unconscionable acts or practices. Fla. Stat. §§ 501.203(3), 501.204(1), 501.211(2). NCA and Ierulli's actions clear qualify as both unfair competitive practices, unfair/unconscionable acts or practices, subjecting them to liability under the act.

61. Nieman has suffered damages by way of NCA/Ierulli's unlawful and unfair practices and has standing to seek recovery under the FDUTPA.

WHEREFORE, Nieman requests that judgment be entered in his favor, against NCA/Ierulli, for outstanding and/or owed wages, commissions, pre-judgment interest, reasonable attorney's fees and costs, emotional distress damages. Nieman is also entitled to equitable relief by way of an order of this Court such that Nieman and others similarly situated should be deeded employees and not independent contractors, and NCA/Ierulli should be ordered to retroactively correct his status to that of W-2 employee, take proper withholding, pay employer's share of employment taxes and other related items, and to refund monies withheld for errors and omissions insurance as an employee such as Nieman is a definitional insured on the insurance policy(ies) of NCA/Ierulli. Plaintiff Nieman also

seeks an injunctive order against NCA/Ierulli whereby they be directed by the Court to cease improper misclassification of employees as independent contractors, and that they be ordered to cease and desist all illegal retaliatory actions against Nieman and others similarly situated, who have properly asserted their rights under the Fair Labor Standards Act, or similar state and/or federal statutes.  Because NCA/Ierulli have shown a pattern and practice of breaching employment agreements, and because their actions are outrageous and shock the conscience, Nieman also prays the Court for an entry of punitive damages against Defendants.

### COUNT VIII: VIOLATIONS OF 26 U.S.C. §7434

62.  Paragraphs 1- 61 are incorporated by reference, as applicable, against all Defendants.

63.  Good evidence supports the conclusion that NCA/Ierulli has already filed, or will in the next thirty days file, information returns to the United States Internal Revenue Service, falsely claiming Nieman as an independent contractor rather than an employee.

64.  Good evidence supports the conclusion that such filings are and/or have been or will be fraudulent, and that such filings have caused and/or will cause upon filing, damages to Nieman and others similarly situated.

65.  Pursuant to §7434, Nieman is entitled to damages and/or other relief.

WHEREFORE, Nieman requests that judgment be entered in his favor, against NCA/Ierulli, for the enumerated statutory damages of the greater of $5,000 or the sum of actual damages, costs of the action, and attorney's fees.

## COUNT IX: DECLARATORY RELIEF

66. Paragraphs 1- 65 are incorporated by reference, as applicable, against all Defendants.

67. Strong and compelling evidence supports the conclusion that based upon the relevant tests under Florida and/or federal law, Nieman and others similarly situated, are employees as to NCA and Ierulli and not independent contractors. NCA/Ierulli are solely engaged in the distinct business of insurance claims administration, which is also Nieman's profession. Nieman was subject to an extreme level of control as to nearly all aspects of his claim adjusting duties by NCA and Ierulli, including the type of estimating system used, mandated use of NCA and client systems, specific forms for reporting, modification of Xactimate (claim estimating system) parameters as to contractor's overhead and profit and deactivation of Xactimate labor minimums. Nieman's work for NCA was hourly for at least one client (John's Eastern Co.), for the majority of assignments he worked for NCA and John's Eastern. Similarly, but separately, the re-write/correction employment phase was purely hourly in nature and also involved substantial control by NCA/Ierulli, and/or their authorized executives or agents as to how the work was done.

WHEREFORE, Nieman requests that the Court enter a declaration that Nieman was an employee, and not an independent contractor, as to NCA/Ierulli, and an associated order nullifying any claims or contracts which NCA/Ierulli may assert as to the proposition that Nieman was an independent contractor as to NCA/Ierulli.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby respectfully demands a trial by jury on all issues set forth herein which are so triable pursuant to the Seventh Amendment to the Constitution of the United States of America.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated this December 26, 2017

/s/ J. Nieman
J.L. Nieman, Plaintiff *Pro Se*
832 Chanterelle Way
Fruit Cove, FL 32259
217 836 4103
JLNieman32259@yahoo.com